**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **8:06CR116** |
| | ) | |
| **DALE GILES,** | ) | **REPORT AND** |
| **CHARMAR BROWN and** | ) | **RECOMMENDATION** |
| **EVEREADA KOURIS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

This matter is before the court on Motions to Suppress and requests for *Franks* hearing filed by defendants Dale Giles, Charmar Brown, and Evereada Kouris (Filings 89, 93 & 95). An evidentiary hearing was held on September 19 and 20, 2006. The transcript (Filings 180 & 181) was filed on October 9, 2006, at which time the motions were deemed submitted.

Defendants ask the court to suppress all evidence derived from the searches of business premises, storage facilities, residences, and vehicles. The majority of the searches were conducted pursuant to search warrants. Defendants contend the warrants were issued without probable cause. They also allege there were material falsehoods in the warrant applications and seek relief under *Franks v. Delaware*, 438 U.S. 154 (1978).

For the reasons discussed below, I recommend that the motions be denied.

# I. FACTUAL BACKGROUND

The searches and warrants at issue are as follows:

| Premises/Vehicle Searched | Date Issued | As to Defendant(s) | Other Info. |
|---|---|---|---|
| Units 245, 246 & 247 at Milt's Mini Storage, 3349 Keystone Drive, Omaha | March 30, 2006 | Dale Giles Charmar Brown | Nighttime Warrant **Exs. 1-3** |
| Units 134, 189, 292, 350, 410 & 478 at Crown Point Storage, 7306 Crown Point Ave., Omaha | March 30, 2006 | Dale Giles Charmar Brown Evereada Kouris (as to Unit 478) | Nighttime Warrant **Exs. 4-9** |
| 7006½ Maple Street, Omaha (business) | April 4, 2006 | Dale Giles Charmar Brown | No-Knock Warrant **Ex. 10** |
| 4816 S. 60th St., Omaha (residence) | April 4, 2006 | Dale Giles Charmar Brown | No-Knock Warrant **Ex. 11** |
| 2926 N. 130th St., Omaha (residence) | April 4, 2006 | Charmar Brown | No-Knock Warrant **Ex. 12** |
| 3547 N. 40th Ave., Omaha (residence) | April 4, 2006 | Dale Giles | No-Knock Warrant **Ex. 13** |
| 1214 Applewood Dr., #G208, Papillion (residence) | April 4, 2006 | Dale Giles Charmar Brown Evereada Kouris | No-Knock Warrant **Exs. 14 & 27** |
| 1214 Applewood Dr., #G208, Papillion (residence) | June 26, 2006 | Evereada Kouris | Consent & Warrant **Exs. 19 & 20** |
| 9723 Yates St., Omaha  (residence) | April 20, 2006 | Dale Giles Charmar Brown | Warrant **Ex. 15** |
| 2118 Ames Ave., Omaha (residence) | April 27, 2006 | Dale Giles Charmar Brown | Warrant **Ex. 16** |
| 3547 N. 40th Ave., Omaha (residence) | June 26, 2006 | Evereada Kouris | Warrant **Ex. 18** |
| Vehicle #1 (black 2005 BMW 750Li) | April 27, 2006 | Dale Giles Charmar Brown | Warrant **Ex. 17** |

| Premises/Vehicle Searched | Date Issued | As to Defendant(s) | Other Info. |
|---|---|---|---|
| Vehicle #2 (blue 2005 BMW 750Li) | April 27, 2006 | Dale Giles<br>Charmar Brown | Warrant<br>**Ex. 17** |
| Vehicle #3 (black 2005 Dodge Magnum) | April 27, 2006 | Dale Giles<br>Charmar Brown | Warrant<br>**Ex. 17** |
| Vehicle #4 (silver 2005 Dodge Magnum) | April 27, 2006 | Dale Giles<br>Charmar Brown | Warrant<br>**Ex. 17** |
| Vehicle #5 (blue 2003 Chevy Suburban) | April 27, 2006 | Dale Giles<br>Charmar Brown | Warrant<br>**Ex. 17** |
| Vehicle #6 (black 2004 Chevy Corvette) | April 27, 2006 | Dale Giles<br>Charmar Brown | Warrant<br>**Ex. 17** |

## A.    The Search Warrant Applications

These search warrants were issued in a continuing investigation that began with the homicides of Benigno Dominguez, Frank Wilkinson, and Faustino Garcia in Omaha on May 4, 2005.  During the homicide investigation, officers received information that the murder victims were involved in large-scale marijuana sales to Dale Giles and Charmar Brown in Omaha.  Consequently, the investigating officers sought search warrants for storage units, business premises, residences and vehicles owned or controlled by Dale Giles, Charmar Brown, and persons associated with them.

The information contained in the various search warrant applications is summarized below.  Cumulative information has been omitted from the summaries of Exhibits 10-19.

### 1.    Search Warrants for Storage Units at 3349 Keystone Drive (Exs. 1-3) and 7306 Crown Point Ave. (Exs. 4-9)

On March 30, 2006, Omaha Police Detectives Brian Bogdanoff and Robert Laney

applied for search warrants for three storage units located at 3349 Keystone Drive, Omaha, Nebraska and six units located at 7603 Crown Point Avenue, Omaha, Nebraska (Exhibits 1-9). As grounds for probable cause, the warrant applications advised that Omaha police officers investigated the homicides of Benigno Dominguez, Frank Wilkinson, and Faustino Garcia on May 4, 2005. On November 29, 2005, officers conducted a follow-up interview with Kendrell Boyston in the Maracopa County, Arizona jail. Boyston told the officers he knew Dominguez and had introduced people to Dominguez for purposes of distributing marijuana. Several loads of marijuana supplied by Dominguez were delivered to someone nicknamed "Clean" who was from the Omaha, Nebraska area. In a photo line-up, Boyston identified Dale Giles as "Clean." In a second photo lineup, Boyston identified a second party known as "Cousin," who was present with Giles when the marijuana was received by Giles in Arizona. "Cousin" was determined to be Charmar Brown.

Boyston stated that Dale Giles was attempting to deal directly with Dominguez. A negotiation took place in Atlanta, Georgia in the springtime of 2005. Boyston told officers that he, Dominguez, Ulysses Sanchez, Roderick Kamalo and Edgar Lujan went to Atlanta because Dominguez had a quantity of marijuana to distribute in that area; the other individuals went to "party." The marijuana was not completely distributed to its intended recipients, so Dale Giles was contacted to come to Atlanta and take the remaining marijuana. Airline records show that on March 5, 2005, Dominguez, Sanchez, Kamalo and Lujan flew from Phoenix to Atlanta. Boyston flew from Phoenix to Atlanta on March 6, 2005.

-4-

According to Boyston, Dale Giles and Charmar Brown arrived together in Atlanta. Boyston overheard Giles directly negotiate with Benigno Dominguez about a large load of marijuana to be delivered to Omaha at a later time. Financial research showed that Charmar Brown's credit card was billed $1,218.49 for the Hawthorne Suites in Atlanta on March 14, 2005. That amount was consistent with the cost of an eight to 10-day stay at the Hawthorne Suites.

Ulysses Sanchez was interviewed on December 20, 2005. He described Benigno Dominguez as a "multi-hundred pound quantity dealer of marijuana." In a photo line-up, Sanchez identified Dale "Clean" Giles and Charmar Brown as individuals who received marijuana from Dominguez in Omaha. Sanchez also advised that several loads of marijuana were obtained by Giles and Brown in Phoenix after Kendrell Boyston connected Giles and Brown with Dominguez.

Sanchez told the officers he was present with Kamalo, Lujan and Boyston when Dominguez delivered a large amount of marijuana to Atlanta in March 2005. Dale Giles and Charmar Brown were contacted about obtaining marijuana and traveled to Atlanta to negotiate a marijuana delivery to Omaha. Sanchez said he believed that he and Boyston would receive a commission from marijuana that was delivered to Omaha.

After the homicides of Benigno Dominguez, Frank Wilkinson and Faustino Garcia, Ulysses Sanchez was contacted by Hector Wilkinson[1] about his knowledge of the marijuana

---

[1] Hector Wilkinson is the twin brother of Frank Wilkinson and the half-brother of Benigno Dominguez.

deal that was set up between Benigno Dominguez and the people from Omaha. Hector told Sanchez that the Mexican source of the marijuana wanted to know information about the Omaha transaction so that the Mexican source could go to Omaha to obtain either money, the marijuana, or retaliation. Hector said he intended to give Sanchez' name and telephone number to the Mexican source so that Sanchez could tell them what he knew about the Omaha recipients of the marijuana.

Ulysses Sanchez stated that he was contacted by a person who identified himself as being associated with the Mexican source. This person wanted to meet with Sanchez and have Sanchez travel to Omaha to identify the Omaha recipients of the marijuana so the Mexican source could "address the situation" regarding the murders. The Mexican source told Sanchez that the marijuana deal was of a very large scale and millions of dollars were unaccounted for. Also, Benigno Dominguez was a friend of the Mexican source. Sanchez was told that the person who delivered the load of marijuana to Omaha was also being contacted to show where the marijuana was exactly delivered. Sanchez told the officers he never did meet with the Mexican source; he feared he would be killed after his cooperation with the Mexican sources.

Hector Wilkinson was interviewed on May 16, 2005. Hector said he learned that his brother, Benigno Dominguez, was a marijuana dealer on a very large scale. After the homicides, Hector was contacted by someone associated with the marijuana source from Mexico. This individual sought information regarding the parties associated with the

marijuana delivery to Omaha.  Hector Wilkinson said he was very concerned that the Mexican source would hold him or his family members responsible for the lost revenue as a result of Benigno's murder.  Hector provided the name and telephone number of Ulysses Sanchez to the Mexican source for detailed information about the Omaha parties associated with the marijuana deal.  During the conversation, Hector learned that approximately 4,000 pounds of marijuana were delivered to Omaha in this transaction.  Hector learned from Ulysses Sanchez that the Omaha people associated with the marijuana deal were two black males, one of whom went by the street name of "Clean," and they were associated with a barber shop.

On December 14, 2005, Officers Bogdanoff and Laney were contacted by DEA agents from Texas and advised of the arrest of Timothy Moreno for transporting 3,500 pounds of marijuana in Texas.  Moreno had told the DEA that he had completed several deliveries of marijuana throughout the United States.  Moreno specifically spoke of one load delivered to black male parties in Omaha and told the DEA that a homicide had occurred regarding this delivery of marijuana.

Bogdanoff and Laney interviewed Timothy Moreno on February 17, 2006.  Moreno could not identify the two black male parties to whom he delivered the marijuana (92:1-8) because he only had a short contact with them.  Moreno believed the marijuana load delivered to Omaha was about 3,500 pounds, wrapped in bales.  He believed there were 64 bales that were unloaded into a private residence.

-7-

Based on their training and experience, Bogdanoff and Laney believed the marijuana delivered to Omaha would have a delivered retail value of between $3-4 million. Individuals will utilize storage units to hide contraband and proceeds from illegal narcotics operations, particularly when dealing with large amounts of marijuana. Storage units can be obtained by drug traffickers in the names of third parties in an effort to hide their connection to the storage units and prevent law enforcement from learning the true identity of the tenants.

Bogdanoff and Laney began an analysis of financial records for Dale Giles and Charmar Brown, including numerous bank records, credit card records, and receipts. They determined that cash expenditures exceeding $100,000 were made since the spring of 2005. Over $190,000 in cash deposits were made into various bank accounts by Dale Giles and Charmar Brown since the spring of 2005. The monies were generally removed from the bank accounts within a week, with a large bank account balance never being maintained.

The officers also conducted research on vehicle purchases by Charmar Brown and Dale Giles. They identified a party named Ryan Joens who sold a 2000 white Ford extended cab truck in June or July 2005 to Dale Giles and Charmar Brown in the name of "K-Nown LLC." Dale Giles signed the bill of sale. The purchase price was $12,000 and was paid in cash, $6,000 from each party. While signing the contract, Giles told Joens that he had marijuana for sale and Joens could contact them if he ever needed any marijuana.

During the investigation, officers established information regarding relatives and associates of Dale Giles and Charmar Brown, including Daramus Brown (the brother of

-8-

Charmar Brown and cousin of Dale Giles).  The officers determined that defendant, Evereada Kouris, was the mother of one of Dale Giles' children and resided at 1214 Applewood Drive, Apt. G208 in Papillion, Nebraska.  They determined from surveillance that Dale Giles often spent the night at this location.  On May 22, 2005, Dale Giles was arrested for possession of marijuana and was in possession of $12,647.00 in cash and a cell phone subscribed to by Evereada Kouris.

The investigation also established that Latasha Willis lived at 2629 N. 130th Street[2] in Omaha.  Bogdanoff was advised by a federal pretrial services officer that Charmar Brown gave his address as 2629 N. 130th Street and resided with his girlfriend, Latasha Willis, who is the mother of their two children.  Willis is the registered owner of a 2003 maroon Monte Carlo which has been utilized by both Charmar Brown and Dale Giles.

The officers checked storage units in the Omaha area and determined that Dale Giles did have two storage units at Milt's Mini Storage at 3349 Keystone Drive in Omaha.  The units were rented on November 13 and November 26, 2002.

On March 9, 2006, Officer Bogdanoff was contacted by personnel at Milt's Mini Storage and advised that a vehicle they knew to be utilized by Dale Giles had entered into the storage unit facility on March 9, 2006.  The vehicle was a 2000 white Ford pickup truck with the name "K-Nown Lawns" displayed on the side.  The storage unit personnel advised Bogdanoff that the code entered into the secured facility indicated that the unit being

---

[2]As discussed below, the parties disagree as to whether the warrant was issued for "2629" or for "2926."

accessed was rented by Daramus Brown on October 1, 2005. Investigating officers determined that the white Ford pickup was registered under the name of K-Nown LLC at 7006 Maple Street and that "K-Nown LLC" is a corporate name utilized by Dale Giles. The address of 7006½ Maple Street is a property rented by Dale Giles and Charmar Brown under the name of "K-Nown Investments LLC."

The investigating officers also contacted representatives of Crown Point Storage Inc. at 7603 Crown Point Ave., Omaha, and learned that both Dale Giles and Charmar Brown had storage units there. Parties associated with Dale Giles and Charmar Brown, i.e., Evereada Kouris and Latasha Willis, also had storage units at Crown Point. Charmar Brown rented Unit 410 on April 27, 2004. Dale Giles had been renting Units 135, 292 and 350 since April 11, 2000. Evereada Kouris had rented Unit 478 since January 3, 2003, and Latasha Willis had rented Unit 189 since April 14, 2005.

Nighttime warrants were requested for all the storage units because the officers wanted to access the units after hours when the storage facilities were closed to the public, so the officers would not be compromised by parties observing officers' activities at the time of the searches.

A Douglas County judge issued the nine warrants, authorizing nighttime searches of the storage units.

The Keystone Drive warrants (Exhibits 1-3) were executed on April 3, 2006, beginning 10:20 p.m. and ending around midnight.

-10-

The Crown Point warrants (Exhibits 4-8) were executed on April 4, 2006 during the daytime between the hours of 11:05 a.m. and 2:43 p.m.

The warrants for all storage units were returned on April 7, 2006. The return form for Unit 410 indicates that the warrant was served, but that no items were seized from the unit. (Ex. 9 at p.13).

### 2.   Search Warrant for 7006½ Maple Street (Ex. 10)

As discussed above, investigating officers learned that the 7006½ Maple Street was rented by Dale Giles and Charmar Brown under the name of "K-Nown Investments LLC." On April 4, 2006, Officers Bogdanoff and Laney applied for a search warrant for 7006½ Maple Street.

The application for this search warrant incorporates the information offered in support the applications for search warrants for the storage units, which were executed on April 3 and April 4, 2006. At the 3349 Keystone Drive facility, officers located approximately 13 pounds of marijuana, venue items to Dale Giles and Daramus Brown, two vehicles connected to Giles, and $337,500.00 in cash.

Officers had conducted surveillance on the address of 7006½ Maple Street since March 24, 2006. They determined that vehicles associated with Dale Giles and Charmar Brown had been entering the address on a regular basis. They also observed "unusual vehicular activity" in which person traveling in vehicles associated with Giles and Brown entered the premises and exited a short time later in different vehicles. Based on their

experience, the officers believed the vehicles were being switched to prevent law enforcement from maintaining consistent surveillance on those individuals.

The officers obtained a rental agreement for 7006½ Maple Street.  The rental agreement showed that Dale Giles and Charmar Brown had been renting the property since May 18, 2005, listing the names of "K-Nown Investments, LLC" and "40 Deuce Music Corporation" as the occupants.  The monthly rent for the property was $1500. Although the rental agreement indicated that the property was going to be used for the storage of "lawn care" and a "towing service," surveillance officers did not see any indication of lawn care equipment or vehicle towing equipment in connection with this address.

A no-knock warrant was requested to avoid safety hazards, based on the officers' knowledge of past violent behavior by Dale Giles and Charmar Brown, and to avoid the alteration and destruction of evidence.

### 3.   Search Warrant for 4816 South 60th Street (Ex. 11)

The application for this search warrant was made on April 4, 2006 and incorporates the information offered in support the applications for search warrants for the storage units. During their investigation, officers learned that Charmar Brown and Dale Giles began to utilize the address of 4816 South 60th Street; they were advised by a federal pretrial services officer that Brown and Giles were starting a music recording business named "40 Deuce Music Corporation" at the 60th Street address.  Surveillance officers observed vehicles associated with Brown and Giles at this address on several occasions.  Also, on the rental

-12-

application for 7006½ Maple Street, Brown listed himself as Vice-President of 40 Deuce Music Corporation.

A no-knock warrant was requested to avoid safety hazards, based on the officers' knowledge of past violent behavior by Dale Giles and Charmar Brown, and to avoid the alteration and destruction of evidence.

### 4.   Search Warrant for 2926 North 130th Street (Ex. 12)

The application for this search warrant was made on April 4, 2006 and incorporates much of the information offered in support the applications for search warrants for the storage units.  Although the warrant application states that Charmar Brown gave his address as 2629 N. 130th Street, the warrant itself is for "2926" N. 130th Street.  The residence is described in the warrant as "a split-entry, wood framed single family dwelling with the numbers '2926' displayed on the mail-box in front of the residence.  The residence has an enclosed double garage.  The residence is beige or tan in color, and is located on the east side of 130th Street."

A no-knock warrant was requested to avoid safety hazards, based on the officers' knowledge of past violent behavior by Dale Giles and Charmar Brown, and to avoid the alteration and destruction of evidence.

### 5.   Search Warrant for 3547 North 40th Avenue (Ex. 13)

In addition to the information given in the applications for search warrants for the storage units, this search warrant application states that the affiant officers conducted

numerous drive-by surveillance operations of the addresses associated with Dale Giles, including 3547 North 40th Avenue.  On several occasions, they observed vehicles used by Giles parked both in the back yard area and on the street in front of the residence.  Officers determined that Dale Giles subscribed to gas and water services at this address.  They requested a no-knock warrant to avoid safety hazards and to avoid the alteration and destruction of evidence.

### 6.   Search Warrant for 1214 Applewood Drive, Apt. #G208 (Exs. 14 & 27)

In the course of the homicide investigation, officers determined that defendant, Evereada Kouris, was the mother of one of Dale Giles' children.  Kouris resided at 1214 Applewood Drive, Apartment #G208 in Papillion, Nebraska, and Dale Giles often spent the night at this location.   On February 27, 2006, officers contacted the manager of the Merrian Club Apartments and were advised that apartment personnel were familiar with the resident of 1214 Applewood Drive #G208.  They identified the resident as Evereada Kouris, who had a child named Dale Giles Jr. who lived with her.  They also told officers that Kouris had a male friend who often spent the night at the apartment.  This individual drove a white Ford pickup truck with "K-Nown Lawns" displayed on the side of the truck, a maroon Cadillac Escalade, or a blue Suburban with decals.  The maroon Cadillac was last seen in the Merrian Club Apartments parking lot on April 1, 2006.

According to apartment personnel, Kouris paid $6.00 per month for rent, based on her government subsidies.  Kouris had also boasted about her 2005 Dodge Durango that was paid

off.  The officers completed research on the vehicle in question and found it was registered to Evereada Kouris at the address of 3811 N. 88th Street.

A Papillion police officer advised Officers Bogdanoff and Laney that Evereada Kouris was arrested for driving during suspension on March 9, 2006.  She also had outstanding warrants.  She had a child with her and was allowed to contact somebody to take possession of the child.  A black male arrived to take the child.  The Papillion officer was shown a picture of Dale Giles and positively identified Dale Giles as the party who picked up the child.

On May 20, 2005 Dale Giles purchased a house at 3811 N. 88th Avenue for $132,000.  Giles paid $33,000 in cash and took out a mortgage with Long Beach Mortgage Company for the remaining $99,000.

On May 22, 2005, Dale Giles was arrested for possession of marijuana.  At that time, he was in possession of $12,647 in cash and a cell phone with the subscriber name of Evereada Kouris through T-Mobile.

Vehicles associated with Dale Giles were observed on numerous occasions by surveillance officers at the Merrian Club Apartments.  On March 28, 2006, the Dale Giles' white Ford pickup truck with "K-Nown Lawns" displayed on its side was parked near building "G" at the Merrian Club Apartments.

Since this property was located in Sarpy County, the warrant application was submitted to a state district judge.  At that time, Officer Bogdanoff asked to supplement the

-15-

application, and his supplemental statement was transcribed.  The transcript (Ex. 27) indicates that the statement was made at 12:00 p.m. on April 4, 2006.  Bogdanoff advised the judge that a search warrant had been served that day at 7002½ Maple Street.  Dale Giles fled on foot from that property and was not yet apprehended.  Bogdanoff also advised the judge that 500 pounds of marijuana and about $337,000 had been seized that day pursuant to the series of search warrants. The only address that had not yet been served with a search warrant was 1214 Applewood Drive #G208, and the officers believed Dale Giles could flee to that location.  Consequently, Bogdanoff sought permission to include Dale Giles as a party to look for.

### 7.   Search Warrant for 9723 Yates Street (Ex. 15)

This search warrant application was made on April 20, 2006, in furtherance of the homicide investigation.  The application states that the property at 9723 Yates Street was under the control or custody of Patrick Hairston and/or Levette Bennett.

The application repeats the background information discussed above and advises that on April 3, 2006, Omaha police officers began to serve a series of 13 search warrants at various locations associated with Dale Giles and Charmar Brown.  Officers seized the following items from the various storage units at 3349 Keystone Drive and 7603 Crown Point Avenue:

- 13 pounds of marijuana packaged in individual one-pound bags
- a green 1973 Chevy Impala registered to Dale Giles
- a 1985 Cadillac El Dorado registered to Dale Giles
- $337,550 in U.S. currency found in two safes and a red box in the 1985 Cadillac

-16-

- 35 pounds of marijuana, ammunition, a semi automatic rifle and a bulletproof vest
- $164,880 in U.S. currency
- automobile paperwork associated with Dale Giles
- two in-transits listing the owner as K-Known Home Services
- a tan 1984 Dodge Ram van containing 646 pounds of marijuana

Charmar Brown was found at 2629 North 130th Street and taken into custody. The officers also found venue items to Charmar Brown, $22,990 in U.S. currency, 60 grams of marijuana, and other items.

At 3547 North 40th Avenue, the officers located venue items to Dale Giles and Evereada Kouris, together with 189 grams of marijuana.

At 4816 South 60th Street, officers found venue items to Charmar Brown, bank receipts to US Bank, business papers in the name of K-Nown LLC, numerous electronic items consistent with an audio recording studio, a blue Rubbermaid brand container containing a scale, two rolls of shrink wrap, and suspected marijuana residue.

At 1214 Applewood Drive #G208, the officers found a rent receipt for the address of 3547 North 40th Avenue, an Arizona identification card to Dale Giles, numerous car titles, and a bulletproof vest.

Dale Giles was seen in the area of 7006½ Maple Street when officers executed the search warrant for that address. They attempted to apprehend Giles, who fled the area driving a 2005 Cadillac Escalade at a high rate of speed. He then abandoned the vehicle. About one hour later, Giles was seen at 7603 Crown Point Avenue attempting to enter the Crown Point Storage facility where officers were executing other search warrants. Dale

-17-

Giles was ultimately taken into custody in this area.

During the course of the investigation, the affiant officers also contacted representatives of Sid Dillon Chevrolet regarding the purchase of a 2005 Cadillac Escalade by Dale Giles on December 7, 2005. The Sid Dillon representatives advised that Dale Giles and Patrick Hairston went to the dealership's Fremont car lot and negotiated the transaction, purchasing the vehicle for $43,995. A trade-in of a 2000 Cadillac DeVille was made for $13,995, leaving a balance of $30,000. Patrick Hairston told Sid Dillon employees that he was Dale Giles' financial advisor and a backer in Dale Giles' music business. Hairston provided $1,000 in cash, leaving a $29,000 balance. The $29,000 balance was paid the following day with a cashier's check from Centris Federal Credit Union, with Patrick Hairston's name listed on the check.

In searching the premises at 7006½ Maple Street, officers found a 2006 black BMW 750Li, which was purchased from Husker Auto Group in Lincoln, Nebraska on December 31, 2005 for $81,550. The owners were listed as PAL Industries and/or Dale Giles. Also located was a 2006 dark blue BMW 750Li purchased from Husker Auto Group on December 31, 2005 for $80,640 with the owners listed as PAL Industries and/or Charmar Brown. There were no active liens on either vehicle.

Officers subpoenaed Centris Federal Credit Union regarding Patrick Hairston. They were supplied a copy of an account card for Hairston's account, doing business as PAL Industries. The account listed the principal place of business as 9723 Yates Street.

-18-

### 8.   Search Warrant for 2118 Ames Avenue (Ex. 16)

This search warrant application, made on April 27, 2006, repeats the history of the homicide investigation and the results of the search warrants previously discussed.  During the investigation, officers determined that Dale Giles and Charmar Brown owned residential property at 2118 Ames Avenue.  Utilities records for this address showed that the gas, water and electrical service were in the name K-Known, a limited liability corporation with the responsible parties listed as Dale Giles and Charmar Brown.  Officers contacted a postal investigator to determine if there were any third party occupants receiving mail at 2118 Ames Avenue.  The postal investigator spoke to the mail carrier for the area; they believed the property was vacant because no mail was received there.  Finally, paperwork seized pursuant to a search warrant for a property utilized by Dale Giles in Avondale, Arizona showed ownership of the address 2118 Ames Avenue, Omaha, Nebraska.

### 9.   Search Warrant for Vehicles Nos. 1-6 (Exhibit 17)

The vehicles in this warrant application were seized in conjunction with the warrant issued for 7006½ Maple Street and included a blue 2003 Chevy pickup truck.[3] While reviewing paperwork at the impound lot, the VIN number on this vehicle showed that it was registered to Charmar Brown; it was originally black in color and re-painted blue.  Upon inspecting the vehicle, the officers determined the blue vehicle was in fact the previously

---

[3]The "Impounded Vehicle" form attached to the warrant return for 7006½ Maple Street (Ex. 10) states that the vehicle was a 2003 model; however, a Memorandum prepared by the FBI on April 8, 2006 (Ex. 22) indicates that this vehicle was a 2004 model.

black pickup truck owned by Charmar Brown. During the inspection, officers located in a hidden compartment underneath the center console $16,000 in U.S. currency, a Taurus .38 special revolver, and 21 rounds of .38 caliber ammunition. In the back passenger compartment were a digital ounce/gram scale, and a Nike shoe box containing venue to Charmar Brown and marijuana residue. The officers applied for a search warrant for the six vehicles at issue to determine whether they also contained contraband in hidden compartments.

### 10. Search Warrant for 3547 North 40th Avenue (Ex. 18)

On June 23, 2006, officers applied for a second search warrant for 3547 North 40th Avenue. They had previously seized marijuana and venue items to Dale Giles and Evereada Kouris from this address. On June 6, 2006, Officer Bogdanoff conducted an interview with Richard McGinnis, who told Bogdanoff he drove loads of marijuana from Arizona to Omaha for Dale Giles. McGinnis estimated he completed 30 loads at an average weight of 500 pounds per load.

McGinnis advised that the last load of marijuana was brought to Omaha on April 3, 2006 and was to be delivered to Dale Giles on April 4, 2006, the day Giles was arrested. After Giles was taken into custody, McGinnis kept 300 pounds of marijuana for approximately 2 days until he received a telephone call from Dale Giles (who was in custody) which was "3-wayed" by Evereada Kouris. During this conversation, Giles referred to the marijuana in a code term of "petitions" and told McGinnis to give the marijuana to his

brother, Lavelle Giles.  McGinnis told Officer Bogdanoff that he did turn over the 300 pounds of marijuana to Lavelle Giles.  McGinnis identified Lavelle Giles by photograph.

In light of the information obtained from McGinnis, Bogdanoff began to review jail phone calls made by Dale Giles to Evereada Kouris.  It was discovered that Kouris had moved into the residence at 3547 North 40th Avenue from her previous address of 1214 Applewood Drive, #G208 in Papillion.

The application then summarizes nine telephone conversations between Dale Giles and Evereada Kouris during the time period from April 8, 2006 through April 27, 2006. Codefendant George "Chucky" Dotson participated in one of the calls.  The substance of the conversations is indicative of drug trafficking activities by Dale Giles, Kouris, Dotson, Lavelle Giles, codefendant George Moore, and others.

Kouris was indicted by the Federal Grand Jury on June 22, 2006 on charges of conspiracy to distribute marijuana.

### 11.  Search Warrant for 1214 Applewood Drive, Apt. #G208 (Ex. 19)

On June 26, 2006, officers applied for a second search warrant for 1214 Applewood Drive, Apartment #G208.  In addition to the matters summarized above, the application includes information that officers seized $81,970 in U.S. currency, 258 pounds of marijuana, a money counting machine, a blue 2003 Chevy Tahoe, a blue 2003 Chevy Pickup Truck, a 2005 silver Dodge Magnum, a black 2005 Dodge Magnum, a blue "2006 BMW 75 [sic] Li," and black "2006 BMW 75 [sic] Li," a black 2004 Chevy Corvette, and other items from

7006½ Maple Street on April 3, 2006.

The application further advised that on the morning of June 26, 2006, Omaha police officers served the search warrant for 3547 North 40th Avenue and took Evereada Kouris (who had been indicted on June 22) into custody based on a federal warrant. In searching the premises, officers found a gallon size zip-loc baggie containing one-quarter pound of marijuana, and numerous items of jewelry. They also found paperwork indicating that Evereada Kouris was still maintaining her apartment at 1214 Applewood Drive #G208. During the search, a conversation took place between Officer Bogdanoff and Dale Giles' children. Bogdanoff learned that Kouris went to the apartment at 1214 Applewood Drive on a regular basis. Bogdanoff had spoken to Kouris on May 3, 2006, after she was the reported victim of a home invasion. At that time, Kouris told Bogdanoff she was vacating the apartment at 1214 Applewood Drive.

### B.  Hearing Testimony

Officers Brian Bogdanoff and Robert Laney were the lead case officers in this investigation. Officer Bogdanoff testified that he is an 18-year veteran of the Omaha Police Department. He served as a narcotics investigator for 10 years and was assigned to the homicide unit for the two years prior to his current assignment to the gang unit. Officer Laney testified that he has been employed as a police officer for the City of Omaha for 17 years. During the past six years, he has served in both the Homicide Unit and the Narcotics Unit. (173:21-174:8).

-22-

On May 4, 2005, Bogdanoff was called to an area just north of 60th and State Streets, where the bodies of Benigno Dominguez, Frank Wilkinson and Faustina Garcia were discovered. (16:8-13). On May 15, 2005, he traveled to Arizona and interviewed Hector Wilkinson. Hector Wilkinson gave information that his brother, Benigno, was a high-level marijuana distributor and there was a load of marijuana delivered to Omaha to a black male with the street name of "Clean." (16:18-17:3; 75:21-76:6). In October 2005, a party named Monte Williams reported that he had been shot by a party named "Clean" and Charmar Brown. At that point, they were able to identify "Clean" as Dale Giles and Charmar Brown. (17:4-9; 76:7-10). The officers did not ask Hector Wilkinson to look at any photographs to identify Dale Giles or Charmar Brown, (76:11-16), and Officer Bogdanoff testified he did not know if Hector Wilkinson ever saw Dale Giles or Charmar Brown. (119:16-23).

Bogdanoff applied for numerous search warrants (Exhibit 1-19) based on information he obtained during the homicide investigation. He began drafting the warrant applications in mid-March 2006. (83:6-9).

The search warrants for certain storage units associated with Dale Giles and Charmar Brown (Exhibits 1-9) were issued on March 30, 2006. (21:23-25). The applications contain identical information. (106:20-107:2). The warrants for the Keystone Drive units were executed on April 3, 2006 between 10:20 p.m. and midnight. The warrants for the Crown Point storage units (except for Unit 410) were executed on April 4, 2006 between 11:05 a.m. and 2:43 p.m. All these warrants were returned on April 7, 2006. (22:1-23:18).

On cross-examination Officer Bogdanoff acknowledged that the applications for the storage units make no reference to any surveillances conducted by the Omaha Police Department prior to March 30, 2006, although surveillance had been conducted. (*See* 56:3-60:10). On redirect, Bogdanoff testified as to the specific incidents of surveillance. (121:1-125:17).

Regarding the search warrants for the nine storage units, Bogdanoff testified that law enforcement "did not have surveillance set up on the storage units, per se," although they did obtain information through research about entrance and exits from the facilities. (61:17-21).

Officer Bogdanoff also acknowledged that law enforcement obtained records showing that Dale Giles and Charmar Brown had reported large sums of money on income tax returns and did not include that information in the search warrant applications. (64:2-65:6). On cross-examination, Bogdanoff testified he was aware that Charmar Brown had filed a tax return for 2004 and the return indicated a gross receipt for sales from a business in the amount of $225,000 and personal income of over $93,000. (105:17-106:25). The U.S. Attorney's office had requested tax information from the IRS regarding Dale Giles and Charmar Brown. Brown's 2004 tax return was not provided to law enforcement until approximately April 2006, and neither individual filed an income tax return for 2005. (118:7-119:11). Officer Laney testified that, to his knowledge, neither Giles nor Brown filed tax returns in 2005. The tax records for 2004 were provided through the defense in an unrelated forfeiture matter. (204:11-23).

-24-

Bogdanoff further explained that he confirmed Giles' and Brown's trip to Atlanta by examining US Bank records showing that Charmar Brown's credit card was used to procure a room at Hawthorne Suites in Atlanta during the relevant time period, rather than by examining any flight records.[4]  (66:20-24).  Officers were not able to obtain confirmation in records from Hawthorne Suites because the hotel had been sold to Shepherd's Hospital; the hotel records were put in storage and could not be found.  The manager of the hotel did tell Bogdanoff that the cost of staying at Hawthorne Suites would have been  around $1,200, an amount consistent with that charged to Charmar Brown's US Bank card.  (102:14-103:23).

Officer Bogdanoff noted that the defendants contend the search warrant applications contain misstatements as to information concerning Daramus Brown.  For example, the application in Exhibit 1 states that the investigating officers established information regarding relatives and associates of Dale Giles and Charmar Brown.  One such party was identified as "Daramus Brown, black male, date of birth 12-6 of '78, who is the brother of Charmar Brown."  (24:9-14).  The application also advises that personnel at Milt's Mini Storage identified the renter of Unit 427 as Daramus Brown, (24:18-21), and that Bogdanoff determined that "Daramus Brown is the brother of Charmar Brown and the cousin of Dale Giles."

Bogdanoff noted that, in their motions to suppress, Charmar Brown and Dale Giles contend that Daramus Brown is a cousin and not a brother.  After Bogdanoff became aware

---

[4]Officer Robert Laney testified on cross-examination it was his understanding that Dale Giles and Charmar Brown drove to Atlanta, so there would not be any flight records.  (190:8-21).

of this contention, he could not recall exactly how he determined Daramus Brown's relationship to Charmar Brown and Dale Giles. According to Officer Bogdanoff, Daramus Brown's name surfaced in three ways: (1) Daramus Brown rented a unit at Milt's Mini Storage; (2) Daramus Brown's name appeared on flight records that were researched in this matter; and (3) Daramus Brown was present at St. Joseph Hospital on February 6, 2005, after Charmar Brown was shot on that day and taken to the hospital. (25:1-26:4; 76:17-77:24). Bogdanoff testified he did not know "the family tree" and "based it now on their statements that they are cousins." (26:7-8). He acknowledged that at least one police report referred to Daramus as a "cousin" of Charmar Brown (78:17-79:11), but testified he did not intend to mislead the judges who issued the search warrants by referring to Daramus as a "brother." (26:11).

The application for Unit 410 at Crown Point states that Charmar Brown was renting Unit No. 410 at Crown Point Storage facility and became the renter on April 27, 2004. This information was repeated in all the applications for the Crown Point units, but not in other applications. Bogdanoff testified that they contacted Crown Point Storage personnel on January 23, 2006 and determined that both Charmar Brown and Dale Giles rented units there. The officers were provided with a list of all tenants. In reviewing the list, they located two additional parties who also rented at that location, i.e., Evereada Kouris and Latasha Willis, who they believed were connected to Charmar Brown and Dale Giles. On January 24, 2006, they were provided with records from Crown Point Storage showing travel in and out of the

-26-

specific units.

Officer Bogdanoff testified that on February 8, 2006, Officer Laney was contacted by personnel from the storage facility and told that Charmar Brown was behind in payment for Unit 410; Crown Point would send Brown a letter to start the process of either getting payment or removing him from the property. The officers were advised on February 24, 2006 that the letter that had been sent out and came back with no response. Consequently, Crown Point Storage advised police that they intended to cut the locks off the unit rented by Charmar Brown and dispose of the property inside that unit. Bogdanoff testified that, upon receiving this information, Officer Laney went to Crown Point Storage and observed the Crown Point personnel open the storage unit. According to Bogdanoff, Laney observed tires, rims, boxes of clothing, bedding, and items that probably were not evidence in a narcotics investigation. Consequently, the police did not take any items from Unit 410. (27:1-28:11; 67:20-68:2; 80:10-81:5). On February 27, 2006, however, Officer Laney was again contacted by the Crown Point storage facility and told that Charmar Brown paid his past balance ($327.50) and was once again in control of Unit 410. (28:15-21; 81:14-19).

In mid-March 2006, the Crown Point manager, Tracy Nusser, told Officer Laney that Charmar Brown "had contact with the facility and indicated that he no longer wanted to have possession of that facility." (28:24-29:2). That was the last communication police had with Crown Point Storage other than the execution of the search warrants. Bogdanoff acknowledged that, as of mid-March, the Omaha police were informed that Charmar Brown

-27-

no longer had a unit at Crown Point Storage. (29:10-12). According to Bogdanoff, however, he had prepared these search warrant applications over a two-week period. At the time he began preparing the affidavits for the various Crown Point Storage units, he did believe Charmar Brown was still renting Unit 410, (29:15-25), and the officers did obtain a warrant for Unit 410 (Ex. 9).

On April 4, 2006, Officer Bogdanoff became aware that Charmar Brown no longer rented a unit at Crown Point Storage, so Unit 410 was not searched that day. He made a warrant return for that unit because he understood he was supposed to return unserved warrants as well as warrants that were served. (30:8-19; 85:8-86:1). Officer Laney also thought they were supposed to return that warrant even though it was not served. Laney admitted on cross-examination that they should have written "not executed" on the warrant for Unit 410, their failure to do so was an oversight, and it appeared from the face of the documents that the unit was searched. (195:9-23).

Laney also testified that the search warrant for Unit 410 at Crown Point Storage was never executed. (177:11-21). He stated that he did have contact with Tracy Nusser, the manager at Crown Point Storage beginning in January 2006 regarding all the suspects' storage units there. (177:25-178:3; 196:5-18).

A report prepared by Officer Laney (Exhibit 26) indicates that Laney spoke to Nusser in August 2006 to confirm certain information. Nusser said that Unit 410 had been rented by Charmar Brown, and Crown Point Storage vacated the unit on February 24, 2006. On

February 10 or 11, 2006, Nusser had called Laney and told him Brown was two or three months behind in his payments for Unit 410.  Nusser sent Charmar Brown a letter warning him that Nusser intended to vacate the unit and would auction off the contents if Brown did not show up and pay the arrearage.  On February 24, 2006, Nusser called Laney and advised that the letter she sent to Charmar Brown came back in the mail, as the address she had for him was not correct.  Laney testified on cross-examination that he did not ask Nusser which address she had on record.  (197:5-6).  Nusser told Laney she was going to vacate Unit 410 that day, cut the lock off, and go through the contents.  Laney went to Crown Point Storage and watched Nusser open the storage unit and examine the contents.  According to Laney, "There was nothing in it." He did not go inside the unit. (197:24-25).  Nusser then put a new lock on the storage unit.  (179:8-180:3).  Nusser contacted Laney several days later and told him that Charmar Brown had come in and paid the arrearage in cash.  In approximately mid-March, Charmar Brown called Nusser and told her that somebody would come and take everything out of the unit that he wanted.  Brown told Nusser he could have the unit back, he was not going to pay for it again, and she could do what she wanted with the rest of the property.  At that point, Nusser took the unit back.  (180:3-11).  Laney agreed that, as of mid-March 2006, Charmar Brown was no longer renting Unit 410, and this information is reflected in his August 2006 report, i.e., Exhibit 26.  (180:14-20).

Officer Laney testified that Charmar Brown's abandonment of Unit 410 was not included in the search warrant applications (Exhibits 4-9) because there was a large amount

of information coming in, and he lost his notes.  It was by oversight that he applied for a search warrant for Unit 410.  (181:1-8).

During the briefing on April 4, 2006, Laney realized that Unit 410 was no longer controlled by Charmar Brown.  Accordingly, the officers decided not to serve that particular warrant.  (181:15-23).  Laney characterized his obtaining a warrant for Unit 410 as a "mistake" rather than as a deliberate attempt to mislead the county judge.  (181:24-182:1).

Dale Giles was arrested on April 4, 2006 at about 12:45 p.m. (71:13-72:2). Bogdanoff testified that copies of the receipts and inventories for the items seized at Milt's Storage and Crown Point Storage were given to Dale Giles on April 4, 2006 who was, at that time, in a cell at Omaha Police Central Station.  He was brought out, taken to an interview room in the jail area, and provided with "a whole series of the receipts and inventories."  (44:12-45:2).

On the morning of April 4, 2006, Bogdanoff began writing search warrants for five properties known to be associated with Dale Giles and Charmar Brown, based on evidence they recovered at Milt's Mini Storage.  (31:1-8).  According to Officer Bogdanoff, the warrants (*see* Exhibits 10-14) were all executed on April 4, 2006, as follows:

| | |
|---|---|
| 7006½ Maple Street, Omaha | 11:15 a.m. |
| 4816 S. 60th St., Omaha | 12:56 p.m. |
| 2629 N. 130th St., Omaha | 11:16 a.m. |
| 3547 N. 40th Ave., Omaha | 2:37 p.m. |
| 1214 Applewood Dr., #G208 | 2:15 p.m.[5] |

(31:11-24).  No-knock warrants were requested and issued for these properties.  The warrants

---

[5]Officer Ted Green testified that he began booking property at 2:15; the search actually began between 12:30 and 1:00 p.m.  (166:7-22).

were executed in a no-knock fashion, except for 1214 Applewood Drive.  They entered that apartment using keys obtained from Evereada Kouris, who had been "secured" when surveillance officers saw her leaving the premises.  All the properties were unoccupied except for 2629 130th Street, which was occupied by Latasha Willis, Charmar Brown, two infants and another female.  (32:3-23).  Charmar Brown was arrested at the residence at 11:16 a.m. on April 4, 2006.  (71:7-12).

Officer Bogdanoff took the Douglas County search warrant applications to the county judge.  After the warrants were signed, he contacted Officer Laney to tell him the warrants were signed, and officers began to execute the Douglas County warrants.  (73:22-74:6).  He then presented the application for the Sarpy County warrant, i.e., for 1214 Applewood Drive #G208, to a district judge.  (74:14-75:5).[6]

According to Officer Bogdanoff, officers from the Omaha Police Department and the Nebraska State Patrol participated in these searches.  Federal law enforcement officers had no part in entering the premises, searching the properties, preparing the search warrant applications, getting judges to issue the warrants, executing the warrants, or planning the

---

[6]Sarpy County and Douglas County are in different judicial districts.  Prior to March 16, 2006, a Nebraska county judge did not have jurisdiction to issue a search warrant for property located outside the judge's district.  The statute in question, Neb. Rev. Stat. § 29-812, was revised during the 2006 Legislative Session and approved by the Governor on March 16, 2006.  The revision appears in § 19 of LB 1115.  Section 48 of LB 1115 provides: "Since an emergency exists, this act takes effect when passed and approved according to law."  Because LB 1115 contained an emergency clause, its provisions became effective the following day, i.e., March 17, 2006.  *See Jaksha v. State*, 241 Neb. 106, 128, 486 N.W.2d 858, 872 (1992).  Consequently, defendant Kouris has withdrawn her argument that the county judge did not have jurisdiction to issue the search warrant for 1214 Applewood Drive, Apartment #G208, on June 26, 2006.  (Filing 180, 13:20-14:12).

execution of the warrants.  (33:1-23).  The returns on the warrants for these properties were made on April 7, 2006.  (34:1).

Bogdanoff testified on redirect that, aside from the nine storage units, officers conducted surveillance on all the other properties for which they sought search warrants. (116:20-117:1).  For possibly three weeks prior to April 4, 2006, a stationary camera had been recording the doors at 7006½ Maple Street, and drive-by surveillance was conducted there.  (132:1-13).  During surveillance of 7006½ Maple Street, Bogdanoff had observed evasive driving tactics.  Although the business at that address was supposed to be a lawn and towing service, there was no indicating of such services being operated at that location. (117:9-118:6).

Turning to the search of 2629 North 130th Street (*see* Exhibit 12), Bogdanoff acknowledged that the first page of the affidavit and the first page of the search warrant give the address **2926** North 130th Street.  Bogdanoff testified that the residence at 2629 North 130th Street was the property actually searched.  The number "2926" was a mistake on the face pages of the affidavit and search warrant.  He first realized a mistake had been made when the defendants filed their motions to suppress.  When officers executed the warrant at 2629 North 130th Street, he believed he had a valid warrant for that address.  He was not present when the property was entered, but arrived at the location when the search was almost completed and the receipt and inventory were being prepared.  He had notified other officers prior to that time that he had the warrant signed.  (34:2-35:4).

-32-

Bogdanoff testified that, prior to April 4, 2006, he had personally viewed the property at 2629 North 130th Street. He described the house as a single-family dwelling, brown in color, with a two-car garage. The residence is on the east side of 130th Street and has a mailbox in front with the numbers on the mailbox. There are white pillars or railing in the front porch area. In Bogdanoff's opinion, the physical description of this house matches the description of the building described on the face pages for the application and warrant for "2926." In fact, the address "2926 North 130th Street" does not exist. (35:10-20).

Bogdanoff became aware of the property at 2629 North 130th Street in late December 2005 while researching the rental of the property at 7006½ Maple Street. He learned through Pretrial Services that Charmar Brown was using the address of 2629, although the Douglas County Assessor's website showed the property was owned by Ken Minarik. (35:23-36:6). He also personally conducted drive-by surveillance of the property on December 29, 2005; January 31, 2006; February 1, 2006; February 6, 2006, and February 23, 2006.

On January 26, 2006, Charmar Brown was actually followed when he went to the federal courthouse for a Pretrial Services meeting. His vehicle went to the area of that neighborhood and was later observed in the driveway. (36:12-25). Regarding surveillance conducted on February 1, 2006, Bogdanoff stated that he did not actually see Charmar Brown get out of his vehicle and go into the house (87:11-13) because the house was located in a cul-de-sac and they could not follow him to the house without compromising the surveillance. (126:20-127:1; 135:5-14). On February 8, 2006, Charmar Brown was once

-33-

again followed when leaving the courthouse. He was driving the same vehicle, which was registered to him at the address of 2629. On February 13 and 15, 2006, they followed Charmar Brown, who was driving the same vehicle, which was registered to that address. Bogdanoff testified that 2629 North 130th Street was the house that he actually wanted to search.

Bogdanoff further testified that he believed Evereada Kouris and Dale Giles resided or spent time at 1214 Applewood Drive, Apartment #G208 (*see* Ex. 14). (37:21-25). On April 4, 2006, Bogdanoff was trying to get all the search warrants signed. The warrants for properties located in Omaha, Douglas County were issued by a county court judge. Since the apartment at 1214 Applewood Drive is located in Sarpy County, the warrant was signed by a district court judge, rather than a county court judge. Bogdanoff was made aware, in some fashion, that Kouris had left the apartment prior to it being searched on April 4, 2006 and that she was stopped just before 11:00 a.m. when Bogdanoff was at the courthouse with the county court judge; he recalled that the warrant for the Sarpy County address was signed around noon. (38:6-23).

Bogdanoff testified that Officer Ted Green advised that he had stopped Evereada Kouris on a street within a half-mile of her residence. The officers explained to Kouris that numerous search warrants were taking place in the City of Omaha and they had applied for a warrant for her residence. Bogdanoff was advised that Kouris actually signed a Permission to Search form for the apartment and the vehicle she was driving during the general time

frame when the warrant was signed. (39:1-19).

After the various search warrants were signed, Bogdanoff notified the officers assigned to search the properties. He then went to each of the properties with the signed search warrants. He went to Kouris' apartment to provide the signed search warrant to either Officer Ted Green or Officer Jen Hansen, who were at the apartment. The residence had not yet been searched when he arrived with the warrant. (39:20-40:5). In his opinion, the officers proceeded with the search of the house pursuant to both Kouris' consent and the search warrant. The return on the warrant for 1214 Applewood Dr., #G208, was made on April 7, 2006. (40:6-15).

A search warrant (Ex. 15) was issued for 9723 Yates on April 20, 2006 and executed at 9:22 a.m. the following day. According to Bogdanoff, the officers knocked on the door; there was no response, and they entered the property. (40:16-25). There were no parties present in the house, and the warrant was returned on Monday, May 1, 2006, one day late. Bogdanoff attributed the one-day delay to the workload associated with processing all warrants and testified he had never returned a warrant to a judge's home on a Sunday. (41:1-16).

The warrant for 2118 Ames Avenue (Ex. 16) was issued on April 27, 2006 and executed the following morning. The officers knocked on the door; there was no response, and they entered the property. No parties were present inside. The warrant was returned on May 1, 2006. (41:17-42:5). The warrant return indicates that nothing was seized from 2118

-35-

Ames Avenue.

The search warrant for the six vehicles (Ex. 17) was issued on April 27, 2006. All the vehicles except the Corvette were searched on May 2, 2006. The Corvette was searched on May 3 after the officers obtained a key from a dealership. The vehicles were then located in the Omaha Police impound lot. The warrant was returned on May 9, 2006, two days late, due to the workload associated with this case. (42:6-24).

A second search warrant for 3547 North 40th Street (Ex. 18) was issued on June 23 and executed on June 26, 2006 at 10:45 a.m. Officers approached the front and back doors. They made contact with Evereada Kouris through a back window. She was directed to come to the front door. Entry was made when Kouris opened the front door. (43:3-12).

A second search warrant for 1214 Applewood (Ex. 19) was issued and executed on June 26, 2006. Officers used keys to effect entry, and there was no one present inside. (43:13-24).

Bogdanoff admitted that the second warrants for 3547 North 40th Street and 1214 Applewood Drive were not returned until July 11, 2006 due to workload and, possibly, Bogdanoff's vacation. (44:1-11).

Officer Bogdanoff further testified that he first became aware of a 2004 Chevrolet truck registered to Charmar and/or Audrey Brown when he began his initial research on the vehicles associated with the parties targeted in his investigation. The 2004 Chevrolet truck was of some significance based on a statement by a witness who lived in the area where the

-36-

three bodies were discovered and who described a black truck.  This vehicle was seized during the search of the premises at 7006½ Maple Street on April 4, 2006.  There were "250-some" pounds of marijuana in the back of the vehicle.  The truck was towed to the Omaha Police impound lot for forfeiture proceedings.  (45:7-46:10; 93:21-94:1).  In his opinion, based on the presence of the marijuana, the vehicle was used to transport marijuana with intent to deliver.  (46:18-19).

This truck was searched two more times, by Bogdanoff and Officer Laney.  The second search occurred on April 14, 2006.  Bogdanoff explained that he attended a meeting at the FBI office that day to go over the property, including vehicles, that had been seized.  Exhibit 22 is a memorandum listing the vehicles that were seized and subject to forfeiture.  The 2004 Chevrolet registered to Charmar and Audrey Brown is listed as Item 5 on the memorandum. During the meeting, it was decided that all the vehicles on the list would be forfeited.  (47:4-48:15).

Bogdanoff became confused during the meeting because Item 5 was described as a dark blue Chevy pickup truck.  His research on Charmar Brown's vehicles had shown a black truck, and he had pictures of the truck from when Brown was shot in February 2006.  Bogdanoff and Laney went to the impound lot to resolve the discrepancy.  They found the vehicle, entered the vehicle to look for its paperwork, and discovered a compartment in the center console area which contained $16,000 in cash, a gun, and rounds of ammunition.  Those items were seized, and the vehicle remained in the impound lot.  (48:19-49:16).

-37-

Bogdanoff admitted on cross-examination that they did not find any vehicle registration and could have identified the vehicle by its VIN, which could be observed outside the vehicle. (97:3-16).

According to Officer Bogdanoff, Charmar Brown's pickup truck was searched a third time, pursuant to a warrant, in August 2006. (49:16-25). The purpose of this search was to look for forensic evidence (blood or hair inside the vehicle) related to the homicide investigation. The search was extensive, "dismantling of the vehicle, cutting open or removing the bed off the truck, inspections of the frame area, near the tailgate area, using alternate light sources ... and also on the inside of the truck." (50:6-9). The inside was searched using alternate light source and Luminol.

Officer Daniel Hayes testified that he has been employed as an Omaha police officer for over 24 years and has been assigned to the Narcotics Unit for one and one-half years. He was previously assigned to the Homicide Unit. (137:6-19). He was part of a team that executed the search warrant at 2629 North 130th Street on April 4, 2006. (137:20-23). The process began with a briefing at approximately 8:15 a.m. at the Omaha Police Training Academy at 52nd and Ames. Members of the Narcotics Unit, the Emergency Response Unit (ERU), and members of the Detective Bureau attended the briefing and were given instructions for executing the search warrants that day. (138:1-17). Hayes knew that a warrant had been signed but did not have a copy of the warrant. (144:17-24).

Officer Hayes testified he was verbally assigned to go to 2629 North 130th Street to

conduct a search of that address, and he wrote down the address during the briefing. (144:13; 145:7-9).  The ERU was directed to make initial entry into the residence, and  Hayes was assigned to transport ERU Sergeant Kurt Sorys to the house so he could review the layout. (138:18-139:11).  At around 10:45 or 10:50 a.m. (140:5), Hayes and Sorys approached the residence from the south on 130th Street and drove past.  Sergeant Sorys looked at the address and wanted Hayes to go back to get another look at something; Hayes did not know what.  Hayes described the house as a split entry single family dwelling, facing west on 130th Street.  The house was light brown in color and had a white plastic railing for a porch railing. (139:12-25).  There were no vehicles parked at the residence.  (140:6-9). As the officers left the area, they saw a pewter-colored Suburban pass by.  Hayes recognized the driver of the Suburban to be, possibly, Charmar Brown.  (140:10-24).  Hayes took Sergeant Sorys back to the staging area where the ERU was waiting.  He then returned to 2629 North 130th Street to conduct surveillance to make sure no on either entered or exited the residence.  (141:2-6).

Hayes watched the residence for 10 to 15 minutes and saw no persons or vehicles arrive at or leave from 2629 North 130th Street.  Police officers entered the residence at 11:16 a.m. and Hayes assisted in searching the residence.  (141:7-20).  Upon entering, the ERU officers encountered "a Mr. Brown" in the upstairs or living room area.  Two women downstairs in the family room.  Infant twin boys were located in an upstairs bedroom. (141:21-142:4).  The pewter-colored Suburban he previously thought might be occupied by Charmar Brown was found parked in the north stall in the garage.  (142:5-14).

-39-

Hayes testified he had no confusion as to the address where this particular warrant was to be served and was never made aware that he was supposed to search 2926 North 130th Street instead of 2629 North 130th Street. (142:15-20). Officer Hayes' observations of 2629 North 130th Street are summarized in his report dated April 5, 2006. (Ex. 21).

Omaha Police Officer Ted Green testified he has been an officer for 24 years and has been assigned to the Criminal Investigations Bureau in the Narcotics Unit for 17 years. (147:21-148:5). Officer Green attended a briefing on April 4, 2006 at approximately 9 a.m., where officers were advised that there would be numerous search warrants executed throughout Omaha, Douglas County and then in Sarpy County. Officers Bogdanoff and Laney were the case officers. Green and other officers were assigned to assist them at the different locations. Officer Green was assigned to assist in the search of 1214 Applewood Drive, Apartment G208, on April 4, 2006. (148:6-25).

During the briefing, the officers were told that 1214 Applewood Drive was a residence occupied by Evereada Kouris and, possibly, Dale Giles. The ERU or a SWAT team was going to execute the actual warrant. Officer Green was assigned to set up surveillance on the address and locate any vehicles involved in the investigation. There were four or five officers conducting surveillance in unmarked vehicles and a marked State Patrol vehicle.

Green went to the location at about 10:15 or 10:20 a.m. and observed a black Dodge Durango parked in front. (149:1-24). Through previous investigations, he knew this vehicle

-40-

was used by Evereada Kouris.  Prior to executing the search warrant, Green saw a black female and two children come out to the Durango.  The children were placed in the back seat. Kouris got into the driver's seat and proceeded to leave the parking lot of the apartment complex.  Green contacted the State Patrol officers and told them to get ready to stop the Durango once it was out of the area.  (151:7-10).  He did not believe Dale Giles was in the vehicle.  (170:20-25).  Kouris was followed away from the location; she proceeded north on 72nd Street and was stopped on a public street about one-half to three-quarters of a mile north of the apartment complex on 72nd Street.  The stop was conducted by uniformed officers driving a marked State Patrol vehicle.  (150:4-25; 153:15).  Green testified he was not aware of any signed warrant at that point.  (168:20-23).

Officer Green explained that Kouris was stopped because, during the briefing, the officers were advised that firearms were involved in this search.  Also, during the briefing, they were advised that Officer Bogdanoff was in the process of obtaining the search warrants; they intended to stop and detain any individual who left the premises before the warrant was executed.  (151:13-23; 152:13-22).  They did not know where Dale Giles was, but knew he had regular contact with this residence.  They decided to stop Kouris out of the area so the stop could not be seen from the apartment complex.  (152:2-23).

Officer Green went to the scene of the traffic stop, where he saw two marked (168:5-15) vehicles.  There were two juveniles in the back of the State Patrol vehicle, and Kouris was in an Omaha Police Division vehicle.  She was later transferred to Green's vehicle.

-41-

(171:14-15).  The State Patrol vehicle was a K-9 unit, and the dog was out of the vehicle.

Green was advised there had been a positive hit on the vehicle by the drug dog.  (153:16-

154:7).

Green testified that he was not in uniform, but was wearing an OPD raid vest with

Omaha Police Division markings on it and a badge.  Officer Green had Kouris get into his

vehicle, where he explained to her that this was a multi-agency investigation and State Patrol,

Omaha Police, and Sarpy County officers were in the process of executing numerous search

warrants throughout the Omaha area.  Green told Kouris they were obtaining a search

warrant for her apartment and asked Kouris for permission to search her vehicle and her

apartment.  During this conversation, Kouris was not handcuffed and had not been arrested.

According to Officer Green, Kouris replied that she did not have any problem with that and

she had nothing to hide.  (154:2-24).  Green testified on cross-examination that he did tell

Kouris she was not under arrest, but she would not be allowed back to her apartment.

(169:19-24).

Green testified he then presented Kouris with a Permission to Search form (Exhibit

20).  He testified that it was his policy to fill out the form with information as to the residence

and/or vehicle in question.  He then briefly reviews the form with the individual, gives the

form to them, and asks if they are willing to sign the form and given the officers permission

to search. (155:1-156:14).  In this case, he completed all the information in Exhibit 20, except

the signature of the consenting person.  According to Officer Green, Kouris signed the

document between 11:30 and 11:40 a.m. and had been in the police vehicle for about 40 to 45 minutes. She did not ask him any questions prior to signing the form and did not ask for an attorney. Officer Green testified that he did not question Kouris, promise her anything in exchange for permission to search, threaten her, or coerce her. Kouris did not complain of any mental or emotional problems and did not ask him any questions. The only thing Green asked Kouris is if she graduated from high school and if she had taken any drugs or narcotics. Kouris told him she had graduated from high school and was not under the influence. (156:15-157:2-25).

Officer Green further testified that Kouris was 29 years old, appeared to be of at least average intelligence, and did not appear to be under the influence. (158:1-8). Green was also aware of Kouris' criminal history; during their briefing that morning, the officers were given photographs of the individuals being investigated, along with their criminal histories and arrest backgrounds. Officer Green was thus aware that Kouris had previously been arrested on a couple felonies, a couple of arrests for failure to appear, a charge of theft by deception, and traffic tickets. She had one prior felony conviction. (159:10-25).

After Kouris signed the consent form, Green contacted his command officers and Officer Bob Laney. Green advised them that Kouris had given permission to search the vehicle and the apartment on Applewood Drive. The vehicle was searched at 11:40 a.m. (171:16-172:2). Notwithstanding the drug dog "hit," nothing of evidentiary value was found in the vehicle. (171:3-6).

-43-

The command officers decided to stay at the location of the traffic stop until the search warrants were physically delivered. Officer Bogdanoff arrived between 12:15 and 12:30 p.m. and gave Green a copy of the search warrant. According to Officer Green, it is the policy of the Nebraska State Patrol that its command officers review the search warrant before executing it, so they were also given a copy of the warrant. During this time, Evereada Kouris remained in Green's vehicle. (161:4-25).

Although the court had issued a no-knock warrant, the officers obtained a key from Evereada Kouris so they could prevent damage to the apartment. Green asked Kouris if there was anybody else in the apartment, and she told him there was not. The officers returned to the apartment building and the SWAT team entered the apartment using the key. (161:25-162:10). No search had been conducted prior to that time. (162:19).

Upon entering, the SWAT team first searched for persons in the apartment and secured the location. They found no one in the apartment. The SWAT team officers left the scene and detectives from the various law enforcement agencies started a systematic search of the residence. They searched a child's room, found no weapons there, and allowed Kouris and the two children to stay in that room while officers searched the rest of the apartment. Kouris remained in that bedroom for the duration of the search and did not ever contact any of the officers to stop the search or to withdraw her consent. (162:20-163:13). Kouris did tell the officers there would probably be a small amount of marijuana, less than an ounce, in the master bathroom. (163:21-25).

-44-

During the search, officers asked Kouris if there was anybody who could take care of the two children. Kouris had the children's grandmother come and pick them up; she was the only person who arrived at the apartment, other than law enforcement. The search ended between 4:00 and 4:30 p.m. There was no arrest warrant for Evereada Kouris at that time, she was not arrested following the search, and she was given a copy of the receipt and inventory. (164:1-17; 168:17-19).

Officer Robert Laney testified he participated in the briefing prior to execution of the search warrants on April 4, 2006. Laney's role was to give an overall briefing as to the various search warrants; he was to give a description of what law enforcement thought was going on in those houses and a basic overview of the investigation. (174:18-24). The briefing occurred around 9:00 or 9:30 a.m. at the training unit located at the Omaha Home for Boys at 52nd and Ames. By the time of the briefing, all the warrants had been signed except for the search warrant for 1214 Applewood Drive. (193:2).

Prior to the briefing, Laney and Bogdanoff had gone to the county judge to have the warrants signed for 7006½ Maple Street, 2629 North 130th Street, 4816 South 60th Street and 3547 North 40th Avenue. (175:11-19). Officer Laney testified that he gave information regarding the address at 2629 North 130th Street and did not ever mention the address of 2926 North 130th Street. The warrant for the apartment on Applewood Drive had not yet been signed. (176:10-11). Laney recalled that he and Bogdanoff went to the county judge's personal residence between 7:30 and 8:00 a.m. From there, Laney dropped Bogdanoff at

-45-

Central Police Headquarters and then went to the Omaha Home for Boys for the briefing. Detective Bogdanoff went to the district court judge for issuance of the Applewood Drive warrant. (176:22-177:10).

Officer Laney further testified that he participated in the April 14, 2006 second search of the 2004 Chevrolet registered to Charmar and/or Audrey Brown. They had information that Charmar Brown owned a black truck, but the truck in the impound lot was navy blue, and they were not sure it was the same truck or a different truck. (200:15-25). The initial purpose for searching the truck at the impound lot was to determine whether the vehicle was blue or black in color which, he agreed, could have been accomplished by examining the VIN. (199:21-200:1). Instead, they decided to search the vehicle for registration or documents showing that Charmar Brown owned the vehicle. (200:4-5). Laney testified he believed the truck had already been searched when it was impounded and he did not expect to find anything but paperwork. (202:8-13). Laney searched the driver's side of the front passenger compartment. He first looked for papers under the visor, then in the ashtray. He looked at the console, and pulled it up, using some force. (203:11-25). At that time, they found a .38-caliber handgun, a large sum of money and rounds of ammunition located in a hidden compartment under a tray in the console. The compartment was "hidden" in that it was not visible to the eye. They did not have to use any special equipment or instruments to remove the tray. (182:2-22). It was not a factory compartment, and was not in an area people would normally open to store things. (201:13-25).

-46-

## II.  LEGAL ANALYSIS

No federal officers took part in entering the premises, searching the properties, preparing the search warrant applications, getting judges to issue the warrants, executing the warrants, or planning the execution of the warrants that are the subject of these motions.  All these activities were conducted by state authorities.

In a federal prosecution, the court evaluates challenges to actions performed by state authorities under federal Fourth Amendment standards.  *United States v. Bieri*, 21 F.3d 811, 816 (8th Cir.), *cert. denied*, 513 U.S. 878 (1994).  "A court must examine the legality of a search by state officers as if made by federal officers."  *Id*. (citing *United States v. Eng*, 753 F.2d 683, 686 (8th Cir. 1985)).  "'[E]vidence seized by state officers in conformity with the Fourth Amendment will not be suppressed in a federal prosecution because *state* law was violated.'"  *Id*.  (quoting *United States v. Moore*, 956 F.2d 843, 847 (8th Cir. 1992) (emphasis in original)).

As the Court of Appeals explained in *United States v. Bell*, 54 F.3d 502, 503-504 (8th Cir. 1995), *cert. denied*, 519 U.S. 955 (1996), the exclusionary rule only requires a federal court to exclude evidence obtained in violation of the Federal Constitution.

> Because states may impose rules for arrests, searches, and seizures that are more restrictive than the Federal Constitution, state law violations do not necessarily offend the Federal Constitution. [*United States v. Wright,* 16 F.3d 1429, 1434 (6th Cir.), *cert. denied,* 512 U.S. 1243 (1994)].  Thus, when a federal court must decide whether to exclude evidence obtained through an arrest, search, or seizure by state officers, the appropriate inquiry is whether the arrest, search, or seizure violated the Federal Constitution, not whether the

arrest, search, or seizure violated state law. *Id.* at 1437; *see United States v. Eastland,* 989 F.2d 760, 767 (5th Cir.), *cert. denied,* 510 U.S. 890 (1993).

A federal court generally does not look to state statutes to assess the validity of an arrest, search, or seizure under the Fourth Amendment. *Wright,* 16 F.3d at 1433; [*United States v. Maholy,* 1 F.3d 718, 721 (8th Cir. 1993)]. Fourth Amendment analysis requires reference to state law in only a few situations. *See* 1 Wayne R. LaFave, *Search and Seizure* § 1.5, at 34 (2d ed. Supp.1994). For example, to show the reasonableness of an inventory search, the Government must show officers complied with state standardized procedures. *Id.* Nevertheless, we do not think Fourth Amendment analysis requires reference to an arrest's legality under state law. *See id.* at 35-36; *United States v. Walker,* 960 F.2d 409, 416 (5th Cir.), *cert. denied,* 506 U.S. 967 (1992). An arrest by state officers is reasonable in the Fourth Amendment sense if it is based on probable cause. *See* 1 LaFave, *supra,* § 1.5, at 35-36; *Walker,* 960 F.2d at 416....

(Parallel citations omitted).

## A.  Requests for *Franks* Hearing

A defendant who alleges falsity or recklessness in a search warrant affidavit must

make a preliminary showing to be entitled to a hearing under *Franks v. Delaware*, 438 U.S.

154, 171 (1978).

A defendant is not entitled to a hearing to determine the veracity of a search warrant affidavit unless "he or she can make a substantial preliminary showing that a false statement was included in the affidavit (or that relevant information was omitted from it) intentionally or recklessly." *United States v. Mathison*, 157 F.3d 541, 547-48 (8th Cir. 1998). As the Supreme Court explained in *Franks*,

[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be

-48-

> false; and they should be accompanied by a statement of supporting reasons.
>
> *Franks*, 438 U.S. at 171; *see also United States v. Wajda*, 810 F.2d 754, 759 (8th Cir. 1987) (noting that the requirement of a substantial preliminary showing "is not lightly met"). The defendant must also show "that the allegedly false statement was necessary to a finding of probable cause or that the alleged omission would have made it impossible to find probable cause." *Mathison*, 157 F.3d at 548.

*United States v. McNeil*, 184 F.3d 770, 775-76 (8th Cir. 1999).

In this case, the defendants complain of factual inaccuracies in the search warrant applications concerning the erroneous identification of Daramus Brown as Charmar Brown's brother rather than cousin, and misinformation that Unit 410 at Crown Point Storage was rented by Charmar Brown on the date of the application. Defendant Kouris also complains that the applications did not inform the issuing court that Unit 410 contained nothing criminal when it was opened by the management on February 24, 2006.

To prevail on this issue, the defendants "'must show that a false statement was included in the affidavit knowingly and intentionally or with reckless disregard for its truth, and that the affidavit's remaining content is insufficient to establish probable cause.'" *United States v. Puckett*, 466 F.3d 626, 629 (8th Cir. 2006) (quoting *United States v. Roberson*, 439 F.3d 934, 939 (8th Cir. 2006), *cert. denied*, 2006 WL 2504012 (Oct. 10, 2006).

The testimony of Officers Bogdanoff and Laney indicates that the search warrant applications were, in fact, inaccurate as to Charmar Brown's dominion over Unit 410 and the relationship between Charmar Brown and Daramus Brown. The court finds, however, that

-49-

the officers satisfactorily explained the reasons for the inaccuracies and the defendants have not met their burden of showing that the statements in question were knowingly and intelligently used or used with reckless disregard for the truth.

The court further finds that no material information was "intentionally or recklessly" omitted from the search warrant applications. Even if the applications were supplemented with the information that no items of evidentiary value were seen when Unit 410 was opened by the manager on February 24, 2006, it would not have been impossible for the issuing judges to find probable cause.

Accordingly, the defendants' requests for a *Franks* hearing are denied.

## B. Standing as to 9723 Yates Street

Dale Giles and Charmar Brown contest the warrant issued for 9723 Yates Street, a residence under the custody or control of Patrick Hairston and/or Levette Bennett. The government contends that Giles and Brown do not have standing to raise this objection.

The defendants bear the burden of showing they are entitled to challenge the search of 9723 Yates Street.

> Fourth Amendment rights are personal and cannot be asserted vicariously. *See United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). A defendant who "fails to prove a sufficiently close connection to the relevant places or objects searched ... has no standing to claim that they were searched or seized illegally." *Id*. A defendant moving to suppress evidence has the burden of showing a legitimate expectation of privacy in the area searched. *See id*. "Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective

> anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case."   *Id.*

*United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000); *see also United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999).   "Legal ownership of a house ... is not necessary to have a legitimate expectation of privacy in it; present dominion or control is sufficient." *United States v. Watson*, 950 F.2d 505, 507 (8th Cir. 1991).

In this case, neither Dale Giles nor Charmar Brown have met the burden of showing they had a reasonable expectation of privacy as to the Yates Street property.  There is no evidence suggesting that Giles or Brown owned, rented, resided in, or controlled the property.  Nor is there any evidence that either Giles or Brown ever visited the residence. Neither defendant was present when the Yates Street property was searched.

Since the defendants have not met their burden of proof, the court finds they do not have standing to contest the search conducted at 9723 Yates Street on April 21, 2006.

## C.   Factual Bases for Finding of Probable Cause

Dale Giles, Charmar Brown, and Evereada Kouris all contend the search warrants were issued without a factual basis for probable cause.

The task of the issuing judge in determining whether probable cause exists to issue a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability" that evidence of a crime would be present. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The

-51-

duty of this court, as a reviewing court, is simply to "ensure that the magistrate or issuing judge had a 'substantial basis for ...  conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).  Great deference is afforded the issuing judge's determination of probable cause. *Illinois v. Gates*, 462 U.S. at 236.

When the issuing judge relied solely upon a supporting affidavit to issue a search warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.  *United States v. Solomo*n, 432 F.3d 824, 827 (8th Cir. 2005); *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003), *cert. denied*, 541 U.S. 1081 (2004).

The court agrees that these search warrant applications "chronicled an exhaustive and lengthy investigation into the defendants that began approximately one year prior to the execution of the warrants."  Plaintiff's Brief [144] at p. 18.  I have reviewed each search warrant application in detail, giving deference to the issuing judges' determinations of probable cause.  Contrary to the defendants' assertions, the factual information is adequately corroborated and it is quite clear why the officers believed that various properties and individuals were associated with criminal activity.

With the exception of the warrant application for 1214 Applewood Drive #G208, which was supplemented, I have considered only the information found with the "four corners" of the officers' affidavits.  I have considered the supplemental information (Ex. 27)

given to the district court judge as to the April 4, 2006 search warrant for 1214 Applewood Drive #G208.  I find that the applications all set forth probable cause, based on reliable and corroborated information, that proceeds (monies, vehicles, and other property of value), records (notes, phone numbers, travel information, credit card information, bank records, billing information from purchases, and ledgers) and equipment (packaging materials, scales, and weapons) from an illegal narcotics distribution would be found in the various locations. Noting that none of the defendants have standing to challenge the search of 9723 Yates Street, I find that all of the search warrant applications demonstrate a fair probability that evidence of a crime would be present at all the various locations.

### D.  Warrant for "2926" North 130th Street

The Fourth Amendment states, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend.  IV.  Charmar Brown contends his residence, 2629 North 130th Street, was searched illegally because the search warrant (Ex. 12) itself bore the address of "2926" North 130th Street and did not describe his residence as a place to be searched.

The error in the address is not dispositive.  In *United States v. Gitcho*, 601 F.2d 369, 371 (8th Cir.), *cert. denied*, 444 U.S. 871 (1979), the court observed that "[t]he test for determining the sufficiency of the description of the place to be searched is whether the place to be searched is described with sufficient particularity as to enable the executing officer to

locate and identify the premises with reasonable effort, and whether there is any reasonable

probability that another premise might be mistakenly searched."

> Where one part of the description of the premises to be searched is
> inaccurate, but the description has other parts which identify the place to be
> searched with particularity, searches pursuant to such warrants have been
> routinely upheld... Other factors which have been cited in upholding searches
> made pursuant to search warrants which contained some inaccuracies in the
> description of the premises to be searched are that the address given in the
> warrant, even if incorrect, still describes the same piece of property ... , that the
> premises intended to be searched are adjacent to those described and all are
> under the control of the defendant ... , that the incorrect address describes a
> place not in existence, or that other parts of the description which are correct
> limit the place to be searched to one place ... , and that the premises which
> were intended to be searched had previously been surveilled or were being
> surveilled while the warrant was obtained.

*United States v. Gitcho*, 601 F.2d at 371 (citations omitted).

In this case, the body of the search warrant application did state that the address in

question was 2629 North 130th Street, and all the references in the body of the application

are to the correct address. Although the numerical portion of the street address was incorrect,

the physical description of the property to be searched was correct. Also, the numerical

address of "2926" does not exist. Prior to obtaining the warrant, and on the day the warrant

was executed, police officers had conducted numerous surveillances of 2629 North 130th

Street. During their briefing, the officers were directed to search 2629 North 130th Street.

They knew which house they were supposed to search.

Considering these factors, the court finds that the residence at 2629 North 130th Street

was described with sufficient particularity to enable the executing officers to locate and

identify the premises with reasonable effort. There was no reasonable probability that another premises might be mistakenly searched. Consequently, I recommend that the motion to suppress be denied as to the search of 2629 North 130th Street.

### E.  Issuance of No-Knock Warrants

The court turns to the defendants' complaints that the judges had no basis to issue no-knock warrants for 7006½ Maple Street, 4816 South 60th Street, 2629 North 130th Street, 3547 North 40th Avenue, or 1214 Applewood Drive #G208.

Because there were no federal officers involved in this investigation, the federal "knock-and-announce" statute, 18 U.S.C. § 3109, does not apply to these search warrants. However, in *Wilson v. Arkansas*, 514 U.S. 927, 930 (1995), the Supreme Court held that the "common-law knock and announce principle forms a part of the Fourth Amendment reasonableness inquiry." The Fourth Amendment requires an inquiry into the reasonableness of a no-knock search even if there is no federal involvement in the search or in procuring the search warrant, and a defendant need not show federal involvement to invoke protections against unreasonable no-knock searches. *See United States v. Scroggins*, 361 F.3d 1075, 1080 (8th Cir. 2004).

> The Fourth Amendment does not forbid no-knock searches. Rather, it requires that searching officers justify dispensing with the knock-and-announce requirement. *See Richards v. Wisconsin*, 520 U.S. 385, 391 (1997). Police officers can justify a no-knock entry if they show they had a reasonable suspicion that knocking and announcing their presence under the particular circumstances would threaten officer safety, be futile, or inhibit the investigation of the crime. *Id*. at 394. This showing is "not high," but is one

-55-

that the police must still make when the defendant challenges the reasonableness of a no-knock search. *Id*. at 394-95.

Although drug investigations frequently pose unique threats to officer safety and the effective preservation of evidence, the Fourth Amendment forbids a blanket exception to the knock-and-announce requirement in drug cases. *Id*. at 394; *United States v. Moore*, 956 F.2d 843, 850 (8th Cir. 1992). The government must still meet its not-high burden of showing that it had a reasonable suspicion that knocking and announcing would be "'dangerous or futile, or ... would inhibit the effective investigation of the crime.'" *United States v. Banks*, 124 S. Ct. 521, 525 (2003) (alteration in original).

The reasonable suspicion standard, of course, is lower than the probable cause standard. When determining whether reasonable suspicion exists, courts must evaluate the totality of the circumstances to determine whether the police officers had a particularized and objective basis for their conclusion. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *Id*.

*United States v. Scroggins*, 361 F.3d at 1081 (parallel citations omitted).

In this case, the no-knock warrants were requested in conjunction with related drug and homicide investigations. Considering the search warrant applications at issue, I find that the affiant officers met the "not high" standard of showing they had a reasonable suspicion that knocking and announcing their presence would threaten officer safety, be futile, or inhibit the investigation of the crime. The authorization of no-knock searches did not violate the defendants' Fourth Amendment rights.

In any event, pursuant to the recent decision in *Hudson v. Michigan*, 126 S. Ct. 2159 (2006), the exclusionary rule does not apply to violations of the knock-and-announce requirement. *Accord United States v. Gaver*, 452 F.3d 1007, 1008 (8th Cir. 2006) ("We need

-56-

not consider whether the officers acted reasonably by entering without knocking and announcing, because even if there were a violation of the Fourth Amendment, the exclusionary rule would be inapplicable.").

### F.   Authorization of Night-Time Searches

Nighttime warrants were requested for the nine storage units at 3349 Keystone Drive and 7603 Crown Point Avenue; however, only the three units at 3349 Keystone Drive were searched at night.  The storage units at Crown Point Avenue were served during the daytime.

Under Neb. Rev. Stat. § 29-814.04, a search warrant "shall direct that it be served in the daytime unless the magistrate or judge is satisfied that the public interest requires that it should not be so restricted, in which case the warrant may direct that it may be served at any time."  The Nebraska Supreme Court has determined that an affidavit in support of a search warrant need not contain a separate statement of facts showing why the public interest requires that the warrant be served at night in order for a nighttime search to be valid.  *See State v. Paul*, 225 Neb. 432, 435, 405 N.W.2d 608, 610 (1987); *State v. Fitch*, 255 Neb. 108, 114, 582 N.W.2d 342, 347 (1998).  However, the affidavit must contain facts which show the reviewing judicial officer that the public interest requires nighttime service.  *State v. Fitch*, 255 Neb. at 115, 582 N.W.2d at 347-348.

Similarly, Fed. R. Crim. P. 41(e)(2)(B) provides that a search warrant must command the officer to "execute the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time."

-57-

In this case, nighttime service was requested because the officers wanted to access the storage units after hours when the storage facilities were closed to the public, so the officers would not be compromised by parties observing officers' activities at the time of the searches.   In the context of this particular investigation, the court finds that the search warrant affidavits sufficiently demonstrated good cause for nighttime service, that the public interest was served by authorizing nighttime service, and that nighttime service was not unreasonable under the Fourth Amendment.

### G.   Alleged Violations of Neb. Rev. Stat. § 29-815

The defendants allege numerous violations of Neb. Rev. Stat. § 29-815, which provides:

> **§ 29-815. Search warrant;  executed and returned;  inventory required.**
> The warrant must be executed and returned within ten days after its date. The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property or shall leave the copy and the receipt at the place from which the property was taken. The return shall be made promptly and shall be accompanied by a written inventory of any property taken. The inventory shall be made in the presence of the applicant for the warrant and the person from whose possession or premises the property was taken if they are present, or in the presence of at least one credible witness other than the applicant for the warrant or the person from whose possession or premises the property was taken, and shall be verified by the officer. The judge or magistrate shall deliver a copy of the inventory upon request to the person from whom or from whose premises the property was taken and to the applicant for the warrant.[7]

---

[7]Rules 41(e) & (f) of the Federal Rules of Criminal Procedure contain similar requirements.

Although § 29-815 requires that a search warrant "be executed and returned within ten days after its date," that requirement is ministerial and does not implicate the Fourth Amendment. *See State v. Hinton*, 226 Neb. 787, 800, 415 N.W.2d 138, 146 (1987). In any event, a federal court generally does not look to state statutes to assess the validity of an arrest, search, or seizure under the Fourth Amendment. *See United States v. Bell*, 54 F.3d 502, 503-504 (8th Cir. 1995), *cert. denied*, 519 U.S. 955 (1996). Nor does Fed. R. Civ. P. 41 apply to any of the warrants, which were issued by state court judges without any federal involvement.

Under such circumstances, the Eighth Circuit has focused its inquiry on whether the defendants suffered prejudice by the state law violation or whether the officers recklessly disregarded proper procedure. In *United States v. Bieri*, 21 F.3d 811, 816 (8th Cir.), *cert. denied*, 513 U.S. 878 (1994), the court observed, "even if Rule 41 was relevant in determining the admissibility of evidence seized pursuant to a warrant issued under state law ... , it provides the [defendants] no relief. We apply the exclusionary rule to violations of Rule 41 only if a defendant is prejudiced or reckless disregard of proper procedure is evident." (Citations omitted).

Similarly, in *United States v. Spencer*, 439 F.3d 905, 913 (8th Cir. 2006), the court noted that "noncompliance with Rule 41 'does not automatically require exclusion of evidence in a federal prosecution.' .... Instead, exclusion is required only if a defendant is prejudiced or if reckless disregard of proper procedure is evident." (Citations omitted).

The record shows that the warrants for the properties referenced in Exhibits 1-14 and Exhibit 16 were all made within the 10-day limit. The return on the 9723 Yates property (Ex. 15) was made on Monday, May 1, 2006, the eleventh day and the first business day after the 10-day period expired.[8]  The returns on the second searches of 3547 N. 40 Avenue (Ex. 19) and 1214 Applewood Drive #G208 (Ex. 19) were made 18 days from the issuance of the warrant.  Copies of the receipts and inventories for the items seized at Milt's Storage and Crown Point Storage were personally delivered to Dale Giles on April 4, 2006.  Evereada Kouris was given copies of the receipts and inventories following the searches of her residences on April 4, 2006 (164:16-17) and June 26, 2006 (Ex. 18).  The receipt and inventory for the second search of the Applewood Drive apartment was left at Kouris' residence at 3547 North 40th Avenue.  The search warrant returns reflect that copies of the warrants and receipts for the property seized were given to Dale Giles or left at the premises. While the record does not clearly show that Charmar Brown was given a receipt for property seized from his residence at 2629 North 130th Street, there is also no evidence demonstrating that he was in any way prejudiced by the alleged lapse.

There is absolutely no evidence that any of the defendants were unfairly prejudiced or that the police officers recklessly disregarded proper procedure.  No Fourth Amendment violation occurred as the result of any alleged violations of Neb. Rev. Stat. § 29-815.

---

[8]In any event, as discussed above, the defendants do not have standing to contest the warrant for 9723 Yates Street.

### H.  Consent Given by Evereada Kouris

Defendant Kouris contends that she was illegally detained when her vehicle was stopped on 72nd Street on April 4, 2006, and her consent (Ex. 20) for the officers to search her vehicle and apartment was not voluntarily given.  The testimony of Officer Green indicates that Kouris' vehicle was stopped to avoid interference with executing the search warrant for 1214 Applewood Drive #G208, and the officers intended to stop and detain any individual who left the premises before the warrant was executed.

I do not believe the legality of the traffic stop is dispositive; consent may be voluntarily given even by a person who is illegally detained.  "Even if a consent to search is the result, in a 'but for' sense, of a fourth amendment violation, we will uphold a subsequent search if the consent was sufficiently an act of free will to purge the original taint." *United States v. Kreisel*, 210 F.3d 868, 869 (8th Cir.), *cert. denied*, 531 U.S. 916 (2000) (quoting *United States v. McGill*, 125 F.3d 642, 644 (8th Cir. 1997), *cert. denied*, 522 U.S. 1141 (1998)).

Assuming, without deciding, that Kouris was illegally detained, "the fact of an illegal detention is only the start, and not the end, of the fourth amendment analysis." *United States v. Kreisel*, 210 F.3d at 869 (citing *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir. 1994)).  In *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973), the Supreme Court held that "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the

-61-

circumstances."  "Consent is voluntary 'if it was the product of an essentially free and
unconstrained choice by its maker, rather than the product of duress or coercion, express or
implied.'" *United States v. Fleck*, 413 F.3d 883, 891 (8th Cir. 2005) (quoting *United States
v. Chaidez*[9], 906 F.2d 377, 380 (8th Cir. 1990)).

Considering the totality of the circumstances in conjunction with the *Chaidez* factors,
the court finds that Kouris voluntarily gave her consent to search the apartment, and her
consent was sufficiently an act of free will to purge any "taint" which might be associated
with the stop of her vehicle.

Even if Kouris did not give voluntary consent, her apartment was searched pursuant
to a valid search warrant.  The search did not commence until after the warrant was obtained,
and the items recovered from her apartment would have been discovered independent of

------

[9]Courts in the Eighth Circuit generally consider the "*Chaidez* factors" to determine if consent was
voluntary:
"Characteristics of persons giving consent" which may be relevant to the question include:
(1) their age; (2) their general intelligence and education; (3) whether they were intoxicated
or under the influence of drugs when consenting; (4) whether they consented after being
informed of their right to withhold consent or of their *Miranda* rights; and (5) whether,
because they had been previously arrested, they were aware of the protections afforded to
suspected criminals by the legal system.
[*Chaidez*, 906 F.2d] at 381 (internal citations omitted).  Characteristics of "the environment in which
consent was given" include:
whether the person who consented (1) was detained and questioned for a long or short time;
(2) was threatened, physically intimidated, or punished by the police; (3) relied upon
promises or misrepresentations made by the police; (4) was in custody or under arrest when
the consent was given; (5) was in a public or a secluded place; or (6) either objected to the
search or stood by silently while the search occurred.
*Id*. (internal citations omitted). The factors should not be applied mechanically, *id*., and no single
factor is dispositive or controlling. *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993).
*United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000).

Kouris' consent.  *See Murray v. United States*, 487 U.S. 533 (1988); *United States v. Khabeer*, 410 F.3d 477 (8th Cir. 2005).

**I.  Search of Charmar Brown's Impounded Vehicle**

Charmar Brown complains that his blue Chevy pickup truck was searched in the impound lot without a warrant on April 14, 2006.  As discussed above, this vehicle was seized during the search of the premises at 7006½ Maple Street on April 4, 2006.  At that time, there were "250-some" pounds of marijuana in the back of the vehicle.  The truck was impounded, was to be forfeited, and was described in Count VII of the indictment returned by the Grand Jury on April 20, 2006.

The court finds that no search warrant was required because the vehicle had been legally seized and impounded pursuant to Neb. Rev. Stat. 28-431(1)(f).  Section 28-431(2) permits a peace officer to search vehicles seized pursuant to 28-431(1)(f) with or without a warrant, if the officer has probable cause to believe that the vehicle is being used to transport controlled substances.  In this case, it was obvious that the vehicle was being used to carry and transport narcotics.

It appears that this issue is governed by *Cooper v. California*, 386 U.S. 58 (1967), in which the Court observed that, while lawful custody of an automobile does not of itself dispense with constitutional requirements of searches thereafter made of it, "the reason for and nature of the custody may constitutionally justify the search." 386 U.S. at 61.  In *Cooper*, an accused had been arrested for selling heroin to an informant and his automobile was

-63-

impounded pending forfeiture proceedings.  The car was searched a week later without a warrant.  The Supreme Court held that this search did not violate the Fourth Amendment:

> [T]he officers seized petitioner's car because they were required to do so by state law. They seized it because of the crime for which they arrested petitioner. They seized it to impound it and they had to keep it until forfeiture proceedings were concluded. Their subsequent search of the car–whether the State had 'legal title' to it or not–was closely related to the reason petitioner was arrested, the reason his car had been impounded, and the reason it was being retained. The forfeiture of petitioner's car did not take place until over four months after it was lawfully seized. It would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it.

386 U.S. at 61-62.  Under the circumstances of the case,  the Court found it could not  "hold unreasonable under the Fourth Amendment the examination or search of a car validly held by officers for use as evidence in a forfeiture proceeding."  *Id*. at 62.  *Accord United States v. Arias-Cardenas*, 36 F.3d 36, 38 (8th Cir. 1994) ("In *Cooper v. California*, ... the Supreme Court held that a warrant is not needed to search a vehicle if probable cause exists to seize it under a forfeiture statute.").

In any event, this vehicle was dismantled on August 30, 2006, pursuant to a search warrant, the validity of which has not been contested.  The items found in the console would have inevitably been discovered at that time.

### J.   *Leon* Exception

I also find that the good faith exception of *United States v. Leon*, 468 U.S. 897 (1984), applies to the search warrants at issue.  *See United States v. Scroggins*, 361 F.3d at 1083.  In *Leon*, the Supreme Court recognized that "the exclusionary rule is designed to deter police

misconduct rather than to punish the errors of judges and magistrates." 468 U.S. at 916. Accordingly, evidence obtained pursuant to a search warrant should not be excluded where the officers executed the warrant "with an objectively reasonable reliance on the magistrate's determination of probable cause." *United States v. Riedesel*, 987 F.2d 1383, 1391 (8th Cir. 1993).

The Court established four exceptions to the good faith exception: (1) when the judicial officer was misled by information in the affidavit that the affiant knew was false or included in the affidavit in reckless disregard of the truth; (2) where the issuing officer wholly abandoned the judicial role; (3) where the affidavit supporting the warrant contains so few indicia of probable cause as to render official belief in existence of probable cause "entirely unreasonable;" and (4) where the warrant itself was so facially deficient that no executing officer could reasonably presume it to be valid. *Leon*, 468 U.S. at 923.

Given the facts of this case, the officers' reliance on the search warrants was objectively reasonable. The issuing judges were not misled by false information included in the affidavits "in reckless disregard of the truth." There is no evidence that the issuing judges abandoned their role, or that any warrant was based on an affidavit so lacking in probable cause as to make belief in it unreasonable. Therefore, should the District Court find that any of the affidavits in this case did not establish probable cause to search, I find that the evidence is nevertheless admissible under the good faith exception of *Leon*.

## III.  RECOMMENDATION

In summary, the court has evaluated all the defendants' challenges to the procurement and execution of these search warrants under federal Fourth Amendment standards and finds the warrants were issued upon probable cause.  The defendants have not shown that they are entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).  None of the defendants have standing to challenge the search of 9723 Yates Street.   The residence at 2629 North 130th Street was described with sufficient particularity in the search warrant issued for "2926" North 130th Street to satisfy Fourth Amendment standards.  The warrants allowing no-knock and/or night-time searches were reasonably issued under the Fourth Amendment.  Nor do any state law violations or irregularities in returning the warrants or providing receipts constitute Fourth Amendment violations.  Defendant Kouris voluntarily consented to the search of her apartment but, in any event, the apartment was searched pursuant to a valid search warrant.  The police were not required to obtain a search warrant for Charmar Brown's impounded vehicle before searching it on April 14, 2006.  Finally, the good faith exception of *United States v. Leon*, 468 U.S. 897 (1984), should apply to all the search warrants at issue.

Because the defendants' arguments are without merit,

**IT IS RECOMMENDED** that Motions to Suppress and Requests for *Franks* Hearing filed by defendants Dale Giles, Charmar Brown, and Evereada Kouris (Filings 89, 93 & 95) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED November 17, 2006.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

-67-